# IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

## CENTRAL DIVISION

| | |
|---|---|
| **MARK H. WILLIAMS, et al.,** | |
| Plaintiffs, | **MEMORANDUM DECISION AND ORDER** |
| v. | |
| **ROGER BANKERT, et al.,** | |
| Defendants. | Case No. 2:05CV503DAK |
| **SOUTHERN UTAH WILDERNESS ALLIANCE, et al.,** | |
| Intervenors-Defendants | |

This matter is before the court on Plaintiff Mark H. Williams, Don Keele, Bonnie Keele, Glenys Sittrud, Victor Johnson, Southeastern Utah OHV Club, Robert J. Telepak, Robert L. Norton, and Rainer Huck's appeal of a decision of the Interior Board of Land Appeals ("IBLA") which affirmed the Bureau of Land Management's ("BLM") implementation of the San Rafael Route Designation Plan ("Travel Plan").[1]  The court held a hearing on Plaintiff's appeal on July

---

[1]  During the litigation, Roger Bankert succeeded Patrick Gubbins as BLM's Price Field Office Manager, Selma Sierra succeeded Sally Wisely as BLM's Utah State Director, and Dirk Kempthorne succeeded Gale Norton as Secretary of the Department of the Interior.  Pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure, these public officers are substituted as defendants for the previously named parties.

1

18, 2007.  Plaintiffs were represented by Curtis G. Kimble, Defendants were represented by

Jeffrey E. Nelson, and Intervenors were represented by Stephen H.M. Bloch.  The Intervenors

were allowed to intervene during the appeal to the IBLA and have intervened in this case as well.

Their arguments are aligned with the Defendants.  Having fully considered the motion and

memoranda submitted by the parties, the administrative record, and the facts and law relevant to

this appeal, the court enters the following Memorandum Decision and Order.

## BACKGROUND

This is an appeal of the Interior Board of Land Appeals' ("IBLA") decision in *Rainer

Huck, et al.*, 168 IBLA 365 (April 18, 2006), upholding the BLM's approval of the San Rafael

Route Designation Plan ("Travel Plan").  The Travel Plan was adopted in order to implement

decisions made in the 1991 San Rafael Resource Management Plan ("RMP") regarding the

management of off-highway vehicle use.  Plaintiffs allege that the BLM's Travel Plan arbitrarily

and capriciously violates the directions of the RMP and unlawfully amends the RMP to close

open access and roads without utilizing legally-required procedures, public participation, and

environmental analysis.  Plaintiffs' action is brought under the Federal Land Policy and

Management Act ("FLPMA") 43 U.S.C. § 1701; the National Environmental Policy Act

("NEPA") 42 U.S.C. § 4321 *et. seq.*; the Administrative Procedure Act ("APA") 5 U.S.C. § 701

*et. seq.*; and the Declaratory Judgment Act, 28 U.S.C. § 2201.

FLPMA requires the BLM to manage public lands "under principles of multiple use and

sustained yield" and "in a manner that will protect the quality of scientific, scenic, historical,

ecological, environmental, air and atmospheric, water resource, and archaeological values."  *Id.* §

1732(a), § 1701 (a)(8).  FLPMA also requires the BLM to "develop, maintain, and, when

appropriate, revise land use plans" to govern its management of the public lands.  43 U.S.C. §
1712(a).  Accordingly, the BLM is charged with implementing planning decisions that balance
various interests and uses.

"'Multiple use management' is a deceptively simple term that describes the enormously
complicated task of striking a balance among the many competing uses to which land can be
put."  *Norton v. Southern Utah Wilderness Alliance*, 542 U.S. 55, 58 (2004).  "Sustained yield"
refers to the BLM's duty "to control depleting uses over time, so as to ensure a high level of
valuable uses in the future."  *Id.*

OHV activity is one of the many multiple uses that must be considered in the land use
planning process.  Therefore, in each land use plan it prepares, the BLM designates all public
lands covered by the plan as either open, limited, or closed to OHV use.  43 C.F.R. Subpart 8340,
8342.

The land within the San Rafael Swell was host to prolific mineral searches throughout the
1900s, culminating with the Uranium Boom in the 1950s.  Consequently, the land contains many
routes and trails.  While the land is not in pristine condition, it is scenic and beautiful.  The land
is under the management of the BLM.  In 1991, the BLM adopted the San Rafael RMP.  The
RMP governs land use on approximately 1.5 million acres of BLM-managed public land in the
San Rafael Resource Area.  This area includes the San Rafael Swell and surrounding areas in
Emery County, Utah.

The RMP designated four OHV categories: (1) open to unrestricted cross-country travel;
(2) closed to travel; (3) open with seasonal restrictions for deer and elk crucial winter ranges and
pronghorn crucial fawning habitat; and (4) limited to designated roads and trails.

The RMP directed that OHV use on approximately 1 million acres of the San Rafael Resource Area be limited to designated roads and trails in order to protect critical soils, scenic resources, crucial wildlife habitat, and to provide recreational opportunities and special management for certain vegetation, cultural, and historic mining resources. The RMP specified that the route-designation process should apply only to dirt roads and trails across public lands. The designation would not apply to state or private lands, BLM system roads, county maintained roads, state or federal highway system roads, or other roads for which existing rights-of-way had been established, all of which remain open to motorized travel.

The RMP also made tentative classifications of eligibility for protection under the Wild and Scenic Rivers Act, 16 U.S.C. §§ 1271 *et seq.*, for certain segments of the Green River, San Rafael River, and Muddy Creek in the San Rafael Resource Area. The RMP directed that the BLM take certain measures, including the limitation of OHV use to designated roads and trails, to afford adequate protection of these river segments until Congress acts to accept or reject the classifications.

Although the RMP required the designation of OHV routes on these lands, it did not make specific designations of roads and trails. Instead, the RMP directed that "ORV use designations developed in the RMP will be made following completion of an ORV implementation plan." The BLM complied with that requirement by adopting the Travel Plan at issue in this appeal.

In 1992, the BLM began soliciting and obtaining public input in the process of developing the Travel Plan. The BLM held eighteen meetings with diverse stakeholders including county commissioners, OHV clubs, environmental groups, mountain biking clubs,

4

hiking groups, and other public land users.  The BLM received more than 1,000 written

comments.  Based on these meetings and written comments, the BLM prepared the preliminary

Route Designation Map, which was released for public review and comment on October 6, 1997.

     After the release of the preliminary Route Designation Map, the BLM briefed the Utah

congressional delegation on the proposal and held public meetings in Utah and Colorado to

discuss the proposal.  BLM received more than 1,500 additional written comments following its

public meeting on the proposed route designations.

     The BLM also prepared an Environmental Assessment ("EA") on the Travel Plan.  The

EA considered various alternatives and selected the following for detailed analysis: (1)

Alternative One would have designated 1045 miles of routes as open to all motorized vehicles;

(2) Alternative Two would have designated 819 miles of routes as open to all motorized vehicles;

(3) Alternative Three would have designated 557 miles of routes as open to all motorized

vehicles and 23 miles open only to motorcycles; (4) Alternative Four would have designated 640

miles of routes as open to all motorized vehicles and 23 miles open only to motorcycles.

     The EA was released for public review and comment on February 7, 2002.  During the

comment period, which extended through April 22, 2002, the BLM received approximately

1,200 substantive comments.  The BLM prepared 23 pages of written responses to comments by

subject matter, with detailed explanations of actions taken in response to those comments.  In a

number of cases, these public comments resulted in corrections to the proposed map in the EA.

     On February 3, 2003, the BLM issued its Decision Record/Finding of No Significant

Impact ("DR/FONSI") for the Travel Plan.  The BLM selected a minor modification of

Alternative Four.  The BLM designated 677 miles of routes as open and 468 miles of routes as

closed to OHV use.  In addition, the BLM limited OHV use in certain areas during specified

periods to protect pronghorn antelope fawning habitat and deer and elk winter ranges.  The BLM

explained why it had not selected the other alternatives studied in the EA.   The DR does not

apply to the approximately 1300 miles of federal, state, and county roads that are the primary

means of travel by visitors to the San Rafael area.

The BLM's DR explained that the BLM was closing 468 miles of routes because the

routes were (1) duplicate routes to destination points; (2) dead-end routes; (3) routes causing

resource damage by inviting "route proliferation"; (4) routes that were naturally revegetating; (5)

routes with conflicts between motorized and non-motorized users; (6) routes through riparian

areas; (7) routes through critical soils susceptible to damage; (8) routes having the most potential

to affect threatened or endangered species; (9) routes that could affect cultural resources; and

(10) routes that could affect the tentative classification of eligible wild and scenic river segments

made in the San Rafael RMP.  The BLM made available to the public the documentation that

contained the detailed explanations of the designation decisions.

Plaintiffs and other parties objected to the route closures in an appeal to the IBLA.  Those

appeals were consolidated, and the Southern Utah Wilderness Alliance ("SUWA") was permitted

to intervene in the appeal.  The IBLA issued a decision upholding the BLM's decision.  The

IBLA held that (1) the BLM appropriately acted to preserve the characteristics of river segments

that are potentially eligible for designation as "wild" or "scenic"; (2) the administrative record

amply supported the BLM's designation of routes; (3) the BLM was not required to determine

the validity of RS 2477 claims as a prerequisite to making its route designation decision; (4) the

Travel Plan is consistent with FLPMA's multiple-use mandate; (5) the BLM complied with

NEPA in adopting the Travel Plan; (6) the BLM solicited and considered public input in the process of developing and approving the Travel Plan; (7) the Travel Plan does not violate the Americans with Disabilities Act; and (8) the record does not contain evidence of impermissible bias on the part of BLM employees.

## STANDARD OF REVIEW

Under Section 704 of the APA, this court has jurisdiction to review "final agency action." 5 U.S.C. § 704.  The final agency action at issue in this case is the IBLA's decision upholding the BLM's adoption of the Travel Plan.  Under Section 706 of the APA, this court must determine whether the IBLA's decision was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A); *see also Utah Environmental Congress v. Zeiroth*, 190 F. Supp. 2d 1265, 1267-68 (D. Utah 2002).   In applying the arbitrary and capricious standard, this court must determine whether the "decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment."  *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 416 (1971).  An "agency's decision is entitled to a presumption of regularity."  *Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560, 1574 (10th Cir. 1994).

## DISCUSSION

Plaintiffs challenge the Travel Plan on various grounds.  They contend that the Travel Plan violates FLPMA because it is inconsistent with the RMP, ignores FLPMA's multiple-use mandate, is based on an incomplete inventory of travel routes, and was adopted without adequate consideration of Plaintiffs' comments and suggestions.  Plaintiffs also argue that the Travel Plan violates NEPA because the BLM did not evaluate appropriate alternatives to the proposed course

of action.  Plaintiffs further claim that certain BLM personnel involved in the preparation of the

Travel Plan were biased against OHV use.  Finally, Plaintiffs contend that  the Travel Plan

violates the Rehabilitation Act of 1973 because it does not permit persons with disabilities to

access areas within the San Rafael Resource Area that are accessible by non-disabled persons.

Plaintiffs allege that they have been unlawfully excluded from using motorized vehicles

on certain designated existing routes.  Plaintiffs are complying with the BLM's allegedly

unlawful restrictions because they fear criminal sanctions should they violate the Travel Plan.

See 43 C.F.R. § 8360.0-7 ("Violations of any regulations in this part by a member of the public,

except for the provisions of § 8365.1.7, are punishable by a fine not to exceed $1,000 and/or

imprisonment not to exceed 12 months.") Plaintiffs ask the court to reverse the BLM's decision

and enjoin the BLM from again attempting to violate its land management plan.

**1.  Bias**

Plaintiffs claim that the preparers of the Travel Plan were personally biased against OHVs

and that the EA is biased on its face.  A claim of bias must be supported by evidence of a

personal interest on the part of the allegedly biased government official.  *Converse v. Udall*, 262

F. Supp. 583, 590 (D. Or. 1966).

Plaintiffs contend that the following observation by Plaintiff Rainer Huck details the

personal bias of the Lead Preparer of the EA:

> Lead Preparer Jaynee R. Levy has a hatred of motorized recreation and access on
> public lands.  She believes that wilderness is the highest and best use for the area
> studied in the EA.  She thus has no place in any function related to designating
> motorized travel routes.  Her bias is so great she has no place within the BLM or
> any other public land agency.  Others on the Staff, such as Tom Gnojek are
> similarly biased.  This bias renders the entire EA a useless and meaningless
> document.

Plaintiffs allege that Jaynee Levy illustrated her predisposition in an email to co-workers, dated September 16, 2002, "I know you would not want to write the DR with what I think should be the final decision although I would be very pleased to have that ultimate power!"  Plaintiffs assert that while Levy did not have the ultimate power, she had substantial power and influence as to what routes did and did not get closed.

Plaintiffs rely on an isolated sentence from a lengthy memorandum prepared by Jaynee Levy, BLM's Price Field Office Outdoor Recreation Specialist.  The quote, however, shows no bias.  The entire memorandum demonstrates Levy's dedication to reviewing thousands of public comments about the Travel Plan, her research into the concerns expressed in the comments, and the information from the comments that she provided to the ultimate decision-maker, Price Field Office Manager Patrick Gubbins.  Huck's unsupported allegation of Levy's "hatred of motorized recreation" does not prove bias.

Plaintiffs also rely on statements made by Kathleen Clarke, the former BLM Director, in a policy speech reported in the Salt Lake Tribune on October 23, 2003.  Clarke criticized freelancing bureaucrats within the BLM who pursued "personal interests" and agendas.  She further stated:  "I'm dealing with an agency that I think lost some discipline, lost some accountability, did a lot of freelancing.  Individual priorities were pursued.  Individual agendas maybe were allowed to take hold and personal interpretation of how things should be done became an issue.  I am discovering there is great disparity between the offices in terms of how they are applying rules and regulations . . . and we are working to reinstitute some management discipline."

However, this vague reference made by former BLM Director Kathleen Clarke regarding

the operation of field offices statewide does not demonstrate bias on the part of any specific

individuals.  Therefore, it provides no grounds for finding bias.

With respect to bias evidenced in the EA itself, Plaintiffs contend that the EA lacks any

actual rational and factual basis.  Plaintiffs claim that nowhere in the text of the document is

there a single reference to the positive and important aspects of Vehicle Assisted Access and

Recreation.  Each discussion is concerned with perceived, possible, or imaginable negative

impacts.  Thus, Plaintiffs claim that the EA demonstrates on its face that the author(s) had a

hatred of vehicle assisted recreation because it fails to recognize and accommodate the

significant and vital activities of such activities.  Plaintiffs assert that an appropriate plan

regulating OHV travel can only be developed by someone with at least some understanding of

this activity and someone who is not an avowed opponent.

Plaintiffs have failed to demonstrate any personal bias in the preparation of the Travel

Plan, and their allegations do not meet the threshold of a "substantial showing of bias."

*Converse*, 262 F. Supp. at 590.  Plaintiffs' claim that the Travel Plan is biased on its face is

nothing more than a repetition of their argument that the plan lacks a rational and factual basis.

The Travel Plan is either rationally and factually supported or its not.   In either event, there is no

demonstration of bias.  Accordingly , the court concludes that the IBLA correctly held that

Plaintiffs failed to support their claim of bias.

## 2.  R.S. 2477 Claims

Plaintiffs argue that the BLM and the IBLA's decisions are arbitrary and capricious

because they failed to consider the issue of valid R.S. 2477 claims.  Agency action is arbitrary

and capricious when the agency "completely fails to consider an important aspect of the issue."

*Sierra Club v. Hodel*, 737 F. Supp. 629, 634 (1990). In this case, Plaintiffs assert that Emery County asserted hundreds of valid R.S. 2477 claims. In the EA, however, the BLM states that "it is beyond the scope of the EA to recognize or reject R.S. 2477 assertions, and this issue is not addressed further."

Plaintiffs take issue with whether it is beyond the scope of the EA to recognize valid R.S. 2477 roads. For example, in the Burr Trail EA, the BLM relied on its recognition of an R.S. 2477 right-of-way as rationale behind its finding that any impacts were not expected to be significant. The court in *SUWA v. National Park Service*, 387 F. Supp. 2d 1178 (2005), held that the National Park Service "fully considered whether there was an R.S. 2477 right of way . . . prior to completing the EA" and "did not fail to consider an important aspect of the problem." *Id*. at 1198.

But the BLM was not required to determine the validity of the R.S. 2477 claims prior to adopting the Travel Plan. One of the alternatives that BLM eliminated from detailed analysis would have designated all asserted R.S. 2477 rights-of-way as "open" to motorized travel. The BLM explained, however, why it decided not to study this alternative further:

> No regulations to either assert or recognize R.S. 2477 rights-of-way currently exist. Courts may ultimately determine the validity of R.S. 2477 assertions. While thousands of R.S. 2477 claims have been asserted by Emery County, it is beyond the scope of this EA to recognize or reject R.S. 2477 assertions, and this issue is not addressed further. Nothing in this EA is intended to provide evidence bearing on or addressing the validity of any R.S. 2477 assertions. At such time as a decision is made on R.S. 2477 assertions, BLM will adjust its travel routes accordingly, if necessary.

Neither FLPMA nor any other statute imposes a duty on the BLM to determine the validity of R.S. 2477 right-of-way claims as part of the process of preparing the Travel Plan.

In *SUWA v. BLM*, 425 F.3d 735 (10th Cir. 2005), the Tenth Circuit explained that, in

determining whether a valid R.S. 2477 right-of-way has been created, "the presumption is in favor of the property owner; and the burden of establishing public use for the required period of time is on those claiming it." *Id.* at 768.   Thus, in developing the Travel Plan, the BLM was entitled to rely on this presumption and only recognize those R.S. 2477 rights-of-way for which claimants had previously carried their evidentiary burden.  The EA provides that the Travel Plan will be adjusted to reflect any R.S. 2477 routes that may be proved in judicial proceedings.

Plaintiffs seek to require the BLM to engage in wholly discretionary, non-binding, internal administrative review of the claimed R.S. 2477 rights-of-way.  Although the Tenth Circuit recognized in *SUWA* that an agency can make such determinations for its own administrative purposes, nothing in that decision suggests that third parties may judicially compel an agency to initiate such internal decision-making.  In fact, such a holding would violate the principle that an agency's failure to engage in discretionary, internal decision-making is not "discrete agency action" subject to judicial review under the APA.  *See Center for Biological Diversity v. Veneman*, 394 F.3d 1108, 1113 (9th Cir. 2005).

In *Kane County v. Kempthore*, Case No. 2:05cv941BSJ (D. Utah June 29, 2007), a recent case from this court, the plaintiffs challenged the BLM's management plan with respect to the Grand Staircase-Escalante National Monument on the ground that the BLM had not made determinations of the validity of the counties' R.S. 2477 claims as part of its development of the restrictions on OHV travel.  The court rejected the argument and ruled that "the final, binding determination of the counties' R.S. 2477 right-of-way claims is a matter for the courts, not the BLM."  The court further ruled that since the counties' claims of infringement on their rights arose from alleged property rights, the appropriate method for asserting those rights would be by

means of an action under the Quiet Title Act, not a challenge to the BLM's management plan.

The court concludes that the IBLA properly rejected Plaintiffs' R.S. 2477 claim.  The BLM was not obligated to resolve R.S. 2477 issues as a part of the Travel Plan.  The Travel Plan has not precluded a finding on these rights-of-way, and Defendants acknowledge that the Travel Plan can be amended if the rights-of-way are demonstrated.  To mandate that an agency make a determination on thousands of R.S. 2477 claims during the decision making on the rest of the Travel Plan could paralyze an agency.

**3.  FLPMA/WSR Designations**

In addition, Plaintiffs argue that the BLM violated FLPMA when it adopted route closures that conflicted with the RMP's directions for wild and scenic rivers.  FLPMA Section 302(a) mandates:  "The Secretary shall manage the public lands . . . in accordance with the land use plans developed by him under section 202 of this Act."  43 U.S.C. § 1732(a).  The Wild and Scenic Rivers Act institutes a national wild and scenic rivers system, designates the initial component of that system, and prescribes "the methods by which, and standards according to which, additional components may be added to the system from time to time."  16 U.S.C. § 1272.

The RMP identifies three river segments as having potential for wild and scenic river designation under the Wild and Scenic River Act.  The RMP states that "[a]dditional planning will be needed to evaluate other rivers for eligibility under the Wild and Scenic Rivers Act. Suitability for designation as a wild and scenic river will be determined in a future plan amendment for the three original rivers and any additional rivers or streams determined to be eligible."

Plaintiffs argue that the RMP standard did not authorize or require the closure of any routes to OHV use or the restriction of dispersed camping.  No future plan amendment was undertaken within the RMP to determine eligibility of the river segments for wild and scenic river designation.  The RMP's 1991 management standard for the river segments remained in effect and were controlling.  The BLM, however, closed or restricted routes, areas, and dispersed camping in the Travel Plan stating, "Management activities are not allowed to damage the existing classification" and "Continuation of OHV use could jeopardize the tentative [wild or scenic] classification."  Plaintiffs claim that this justification is erroneous because there was no existing wild and scenic river classification under the RMP, tentative or otherwise. Therefore, Plaintiffs assert that the BLM has failed to show a rational basis for the WSR rationale applied and has failed to support the rationale by technical analysis.

The RMP, however, directed that OHV use should be limited to designated roads and trails in order to protect resources, including the tentative classifications of certain river segments under the WSR Act.  The Travel Plan closed some routes to protect the RMP's tentative classification of certain river segments as "wild" or "scenic" under the WSR Act.  The Travel Plan did not alter or supersede the RMP, nor did it modify the tentative river classifications in the RMP.  Rather, the Travel Plan complied with the RMP's direction to protect the eligibility of those river segments under the statute.  Thus, the BLM's decision to close certain routes to protect tentative classifications under the Wild and Scenic Rivers Act is consistent with the RMP.

Plaintiff's argument that the BLM's action violated FLPMA because it is the equivalent of designating these river segments as wild and scenic rivers, and that such designation can be

14

done only through a plan amendment, ignores the purpose of the Travel Plan.   If the Travel Plan

had not addressed these areas then it would have interfered with the RMP's tentative

classification of the river segments.   Therefore, the court concludes that the IBLA correctly held

that the BLM's actions were an appropriate implementation of the RMP's requirements.

**4.  NEPA/WSR Designations**

Plaintiffs further argue that the BLM violated NEPA Section 102(2)(E) when it closed

routes based on WSR considerations and did not study, develop, or describe appropriate

alternatives to the action.   Section 102(2)(E) requires environmental analysis prior to action on a

proposal and mandates that all agencies shall "study, develop, and describe appropriate

alternatives to recommended courses of action in any proposal which involves unresolved

conflicts concerning alternative uses of available resources."   42 U.S.C. § 4332(2)(E) (2006).

Plaintiffs assert that the BLM also violated 40 C.F.R. § 1506.1(c), which provides that

> [w]hile work on a required program environmental
> impact statement is in progress and the action is not
> covered by an existing program statement, agencies
> shall not undertake in the interim any major federal
> action covered by the program which may
> significantly affect the quality of the human
> environment unless such action: (1) Is justified
> independently of the program; (2) Is itself
> accompanied by an adequate environmental impact
> statement; and (3) Will not prejudice the ultimate
> decision on the program when it tends to determine
> subsequent development or limit alternatives.

Defendants argue that Plaintiffs' entire NEPA-based argument consists of a citation to a

NEPA statute and a reference to a regulation issued by the Council on Environmental Quality

and fails to give any factual or legal analysis.   Plaintiffs' analysis of this argument is so thin that

the court would be justified in declining to address it for that reason alone.   *Utah Shared Access*

15

*Alliance v. Carpenter*, 463 F.3d 1125, 1137 n.4 (10th Cir. 2006).  In any event, Plaintiffs did not

present these NEPA issues to the IBLA and thus waived their right to present them here.  *Wilson*

*v. Hodel*, 758 F.2d 1369, 1372 (10th Cir. 1985).

Addressing the merits of Plaintiffs' contentions, however, the court turns to the statute

that requires agencies to consider alternatives to proposed courses of action, 42 U.S.C. §

4332(2)(E).  In developing the Travel Plan, the BLM considered numerous alternatives from

which four were selected for detailed analysis.  The Travel Plan is based on Alternative Four

with modifications that were prompted in part by public input.  Thus, the BLM followed the

statutory requirement to consider alternatives.

The regulation that Plaintiffs cite imposes certain requirements "[w]hile work on a

required program environmental impact statement is in progress and the action is not covered by

an existing program statement."  40 C.F.R. § 1506.1(c).  The Travel Plan, however, was covered

by an existing program statement, the RMP.  Therefore, the cited regulation has no application to

the Travel Plan.  Accordingly, the court find no basis for finding a violation of NEPA or 40

C.F.R. § 1506.1(c) even if the court considers the merits of Plaintiffs' argument.

**5.  FLPMA/Inventory of Routes & Consideration of Comments**

Plaintiffs contend that the BLM violated FLPMA Section 201 by failing to maintain a

factually accurate inventory of motorized routes and areas and their use patterns.  FLPMA

Section 201 mandates that the BLM "shall prepare and maintain on a constant basis an inventory

of all public lands and their resources and other values (including, but not limited to, outdoor

recreation and scenic values) . . . This inventory shall be kept current."  43 U.S.C. § 1711.

16

Plaintiffs claim that the Travel Plan, however, closes constructed motorized routes and restricted or eliminated dispersed camping based upon its inaccurate inventory.

Victor Johnson, one of the Plaintiffs, went to great lengths to provide the BLM with accurate detailed maps and inventories of motorized routes. While working with various BLM field and office personnel, Johnson claims that they would "marvel at the detail of his maps" and give him a dumbfounded look when he told them that he had sent the same maps to the head office more than once and they should have already seen them.

Johnson's individual experience with the Price Field Office, however, does not demonstrate a violation of FLPMA. The BLM conducted field examinations of the routes challenged by Mr. Johnson and in many cases added routes to its inventory map. The BLM's decision was based on an extensive inventory database of motorized routes compiled in the ten years following the adoption of the 1991 RMP. Rather than dispute the route inventory that the BLM compiled, Plaintiffs appear to challenge the fact that the BLM did not modify the inventory to coincide with Plaintiffs' opinions. The question for the IBLA was not whether the BLM's decision was consistent with the opinion of any particular party, but instead whether the decision was based on substantial evidence in the record. The BLM relied on extensive route information that was compiled not only from BM's existing data base, but also from information supplied by various parties, and BLM field work during the time it was preparing the Travel Plan. The IBLA, therefore, correctly concluded that the BLM's decision was amply supported by the record.

Plaintiffs further claim that the BLM violated FLPMA section 202 by refusing to receive, to acknowledge, and/or to reasonably consider their comments regarding routes that were

17

subsequently closed to motorized uses in the Travel Plan.  Section 202 states that the "Secretary shall allow an opportunity for public involvement" by establishing procedures that allow notice and an opportunity to comment on the plans relating to the management of public land.  43 U.S.C. § 1712(f).

Plaintiffs erroneously allege that the BLM was amending the RMP when it adopted the Travel Plan.  The Travel Plan did not amend the RMP but rather implemented its directions. FLPMA's provisions regarding public participation in the land-use planning process are inapplicable, and the IBLA correctly noted that the applicable public participation requirements are not found in FLPMA but in the regulations implementing NEPA, such as 40 C.F.R. § 1500.2(d) and Part 1503.

Nonetheless, the record belies Plaintiffs' allegation that the public was not adequately involved in the process.  The BLM held numerous meetings with various interest groups and received thousands of written comments in the process of developing both the preliminary Route Designation Map and the EA on the Travel Plan.  After the release of the EA, the BLM received approximately 1200 additional substantive comments and prepared over 125 specific responses to these comments.  The BLM's responses to comments on specific routes demonstrates that the BLM fully considered and responded to the public comments.  The BLM also decided to leave open certain routes that it had originally proposed closing.

Therefore, the record adequately demonstrates that the ultimate decision was reached based on the BLM's responses to public comments.  The record does not support Plaintiffs' allegation that the BLM violated Section 202 of FLPMA by failing to provide for adequate public participation during the preparation of the Travel Plan.

18

**6. FLPMA/Multiple-Use Mandate**

Plaintiffs also contend that the Travel Plan violates FLPMA's multiple-use mandate because it does not utilize the combination of resource values that will best meet the present and future needs of the American people. FLPMA directs the BLM to manage public lands under the principle of multiple use, which is defined in part as "the management of public lands and their various resource values so that they are utilized in the combination that will best meet the present and future needs of the American people." 43 U.S.C. § 1702(c).

Plaintiffs argue that BLM's weighing of the resource values was unreasonable and the balance that BLM chose violates FLPMA's multiple-use mandate. However, FLPMA's multiple-use mandate does not require that all uses be allowed on all areas of the public lands. That would preclude any kind of balance. The purpose of the mandate is to require the BLM to evaluate and choose an appropriate balance of resource uses, which involves tradeoffs between competing uses.

The Plaintiffs' burden is to show that the balance of uses that the BLM chose reflects a "clear error of judgment." *Citizens to Preserve Overton Park*, 401 U.S. at 416. The BLM evaluated several alternatives, solicited public input, and designated routes in a manner that would provide for a variety of uses of the lands while protecting the resources of the area. The IBLA correctly concluded that "[Plaintiffs'] simple disagreement with the balance BLM chose does not establish that the closure of various OHV routes violated FLPMA's multiple use mandate."

19

**7.  Vocational Rehabilitation Act**

Plaintiffs argue that the Travel Plan violates the Vocational Rehabilitation Act.  The

Vocational Rehabilitation Act prohibits discrimination on the basis of disability by the federal

government.  Section 504 states:

> No otherwise qualified individual with a disability in the United
> States, as defined in section 705 of this title, shall, solely by reason
> of her or his disability, be excluded from the participation in, be
> denied the benefits of, or be subjected to discrimination under any
> program or activity receiving Federal financial assistance or under
> any program or activity conducted by an Executive agency or by
> the United States Postal Service.

29 U.S.C. § 794.

Plaintiffs assert that the Travel Plan denies Plaintiffs motorized vehicle access to areas to

which non-disabled individuals have access.  Plaintiffs contend that the central purpose of the

Rehabilitation Act is to assure "evenhanded treatment between the disabled and the able-bodied."

*See Doe v. Pfrommer*, 148 F.3d 73, 82 (2d Cir. 1998).  However, by excluding the disabled from

equitable access to these areas, Plaintiffs claim that the BLM denies them the benefits of public

lands.

Plaintiff Robert Norton provided a Statement of Reasons for Appeal that states that using

a motorized vehicle is a requirement for him to travel long distances in our public back country

because his Rheumatoid Arthritis prevents him from hiking.  He also states that his elderly

mother and father can no longer hike into areas of outstanding beauty such as Seger's Hole

because of various ailments and conditions.

It is not, however, a violation of the Rehabilitation Act that able-bodied persons can

explore off-trail areas on foot or mountain bike while disabled persons cannot.  Section 504 of

the Rehabilitation Act does not require absolute equality of access between the disabled and the able bodied but, rather, requires a balance between the need for reasonable accommodation of the handicapped and the manageable bonds of the federal program. *Alexander v. Choate*, 469 U.S. 287, 297-99 (1985).

In the 1991 RMP, the BLM decided that the distinctive character of the San Rafael Resource Area could only be preserved by limiting OHV access to designated routes.  The BLM did not unreasonably limit motorized access, however.  Motorized access is available on more than 1300 miles of primary access roads within the area that are not subject to the Travel Plan, and another 677 miles of open routes that are designated by the Travel Plan.

The Travel Plan provides meaningful access to the Area while fulfilling the BLM's statutory duty to protect those lands and resources. Allowing unlimited cross-country motorized access for all handicapped persons would fundamentally alter the balance the BLM has struck among the multiple uses in both the RMP and the Travel Plan.  Therefore, the Travel Plan does not run afoul of the Rehabilitation Act.  Rather, the Travel Plan meets the requirements of the Rehabilitation Act because it provides handicapped persons meaningful motorized access to the San Rafael Resource Area.

Furthermore, there are procedural deficiencies with respect to Plaintiffs' Rehabilitation Act claim.  The BLM's decision to limit OHV travel to designated routes occurred in the 1991 RMP.  This case is the first time Plaintiffs have challenged that determination.  In addition, the Rehabilitation Act has its own procedural requirements.  Written complaints of noncompliance must be filed with the Director of the Office for Equal Opportunity of the Department of the Interior within 180 days of the alleged discrimination.  The agency then investigates the

21

complaint and responds.  If the complainant is dissatisfied with the agency's response, he or she

can appeal the decision.  Plaintiffs, in this case, have not exhausted their administrative remedies

on such a claim, which is necessary before seeking judicial relief.  *McKart v. United States*, 395

U.S. 185, 193 (1969).

Moreover, Plaintiffs did not raise this issue in their appeal to the IBLA.  The claim was

first asserted in Plaintiffs' Complaint filed in this case.  Although Plaintiff Huck asserted a claim

under the Americans with Disabilities Act, the IBLA summarily dismissed that argument based

on Huck's failure to present any evidence that he met the ADA's disability requirements.  The

Rehabilitation Act was never raised before the IBLA. That failure prevents Plaintiffs from raising

the issue for the first time before this court.  Accordingly, Plaintiffs have waived their

Rehabilitation Act claim.  *Nevada v. Dept. of Energy*, 457 F.3d 78, 88-89 (D.C. Cir. 2006);

*Wilson v. Hodell*, 758 F.2d 1369, 1372-73 (10th Cir. 1985).

Therefore, the court concludes that this claim is not properly before the court.  Plaintiffs

have failed to exhaust the appropriate administrative remedies for such a claim and failed to

assert the claim before the IBLA.  Even if the claim was properly before the court, it fails because

there is no requirement that a disabled person have access to every trail that an able bodied

person can access.  There are numerous routes accessible to motorized vehicles in the Travel

Plan.  Therefore, the Travel Plan provides meaningful access under the requirements of the

Rehabilitation Act.

## CONCLUSION

Based on the above reasoning, the court concludes that there is no basis for overturning

the decision of the IBLA affirming the BLM's adoption of the Travel Plan.  Therefore, the court

affirms Defendants' adoption of the Travel Plan and dismisses Plaintiffs' appeal.

DATED this 18th day of October, 2007.

DALE A. KIMBALL
United States District Judge